UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-22399-CIV-COOKE/DUBÉ

CONSENT CASE

DIANA I. MENDEZ,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.
_____/

## MEMORANDUM ORDER

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Defendant (D.E. #17) and the Motion for Summary Judgment filed by the Plaintiff (D.E. #18) pursuant to the consent of the parties and an Order of Reference entered by the Honorable Marcia G. Cooke, United States District Judge. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff, Diana I. Mendez (hereinafter "Mendez" or "Plaintiff").

### I. FACTS

Mendez filed an application for disability insurance benefits (DIB). (R. 53).[1] The application was denied initially and on reconsideration. (R. 40, 46). Following a hearing (R. 274-302), the ALJ issued a decision denying the request for benefits. (R. 20-31). A request for review filed with the Appeals Council was denied. (R. 5).

---

[1] All references are to the record of the administrative proceeding filed as part of the Defendant's answer.

The Plaintiff, age 37 at the time of the hearing on June 15, 2005, testified that she lived with her husband and their 6 year old child. Mendez stated that she graduated from high school and completed one year of college. (R. 277-278). Additionally, Mendez testified that she does not cook or do laundry and that she "just can't do anything anymore." (R. 292).

The Plaintiff testified that her last job was with Bell South Telephone Communication until she was laid of on September 30, 2003.[2] (R. 278). Mendez stated that she had been receiving unemployment for "a long time." (R. 279). Additionally, the Plaintiff stated that although she is on anti-depressants, she is unable to work due to anxiety attacks and getting very nervous around people. The Plaintiff also stated that she became very depressed and nervous a couple of years earlier after her daughter had a grand mal seizure and was in a coma. (R. 279).

When asked if she would be able to hold a job as a parking lot attendant where she would not be working around people, Mendez responded that she would "have a hard time standing up for long periods of time." (R. 279). The ALJ pointed out that she would be able to sit, stand, stretch her legs and walk around if no cars were going in and out. The Plaintiff responded that she suffers from migraines and neuropathy. According to the Plaintiff, the neuropathy prevents her from working because she gets numb in her hands and face about two to three times during the day. (R. 280). The Plaintiff also stated that once or twice a day she gets cramps in her legs and she falls down. (R. 284).

Additionally, the following colloquy occurred between Mendez and the ALJ:

> Q: Now, your doctors says you have MS. Who diagnosed you with that?
>
> A: Well, I mean, that, that was I'm being champion worked up for

---

[2] Mendez stated that the last date of her employment was October 23, 2003, however, she later stated that she was laid off on September 30 and that October 23, 2003 was her alleged disability date. (R. 278).

2

> that.
>
> Q: What kind of work up do they do?
>
> A: The MRI's, I'm being worked up at the University of Miami.
>
> Q: Was an MRI done?
>
> A: Yes. With contrast, without contrast.
>
> Q: What did that show?
>
> A: There was a lesion I believe on the right side. I think it's on the right side, if I'm not mistaken, the right side of my brain.
>
> ALJ: Why don't I have those results?
>
> ATTY: The MRI, Judge, was done years ago. It's not anything recent. The only things you have recent are those CV scans, which I show as normal. So they're not sure of the diagnosis of the rest.

(R. 280-281).

The Plaintiff testified that her husband drove her to the hearing and that although she has a driver's license, she does not drive anymore because when she does drive, she wants to drive her "car over the bridge into the ocean." (R. 278, 281, 288).

Additionally, the Plaintiff testified that her husband picks up her daughter from school and takes her to her mother-in-law's house. According to the Plaintiff, she is unable to care for her daughter since her daughter has a seizure disorder, and she is unable to "sit down and give her her lunch" because she is a "picky eater." (R. 282). When asked if she would be able to take care of her daughter if she were the only one able to do so, the Plaintiff responded: "Physically unable to do it? It's, it's more - - it's not only physically, Your Honor. It's emotional now." (R. 283). Mendez also stated that her "daughter requires a lot emotionally" and that she has "absolutely no patience for [her]

3

daughter." (R. 284-285). The Plaintiff testified that she is currently receiving psychiatric therapy. (R. 285).

When asked by her attorney what would keep her from going to work on a 40 hour a week basis, the Plaintiff responded: "My emotions." (R. 286). The Plaintiff testified that she feels "horrible" about herself, she doesn't "know what's wrong," she "can't even bathe" or "do anything for [herself] anymore." (R. 286). Additionally, her attorney asked if there was any history of emotional problems in her family, Mendez responded: "yes" her mother and brother have both attempted suicide, and her mother has had two nervous breakdowns. Mendez also stated that "half of my family is bipolar." Additionally, her uncle killed himself and his children. The Plaintiff testified that she has never tried to commit suicide, but has thought about it. (R. 286-287).

According to the Plaintiff, her typical day consists of her husband getting her up and giving her breakfast and her pills, and making her take a bath. Her husband also gets their daughter up and dresses her for school. (R. 288-289). The Plaintiff testified that three or four days per week, she does not shower because she doesn't "feel like it" and she fights with her husband and he just goes to work. (R. 289-290). Additionally, Mendez stated that her husband picks up their daughter from school during his lunch hour and takes her to his mother's house, and on the weekends her husband encourages her to visit her mother so that Mendez would not be around their daughter. (R. 290).

When asked if she ever started tasks and didn't finish them, she responded: "Yeah." Mendez gave an example of a "ceramic problem" that she was helping her daughter with and was unable to finish it. (R. 290).

The ALJ asked the Plaintiff why she was able to answer a cell phone and not her phone at home. Mendez responded: "Because I have to walk to it." (R. 291). The following colloquy then

4

took place between the Plaintiff and the ALJ:

> Q That doesn't - - well, try this. You don't have - - you have a cell phone that rings. Why would you unplug your home phone?
>
> A Because it can't be this - - I have to make any - - I've always had a cell phone. And at the beginning my daughter at the beginning, when - - I've always had a phone. And my daughter is taught how to use the phone. And when a certain on having depression, I was still working. And my daughter has had to - - she's memorized numbers. Memorizes like mom's number, and her dad's number.
>
> Q But, but it doesn't explain to me, ma'am, why you're capable of answering and talking on a cell phone, but not your home phone? You told me you, you're so upset you unplug the home phone. But if you carry a cell phone around with you. People can still call you.
>
> A I get - - I use it for myself and for my daughter. I let my daughter use my cell phone.

(R. 291-292).

A Vocational Expert, Christina Fannin testified at the hearing. (R. 292). Fannin classified the Plaintiff's prior position as a customer service representative in sales and some trouble shooting for Bell South as sedentary, skilled. (R. 293-294). The VE testified that there was nothing physically that would prevent the Plaintiff from performing her past relevant work. (R. 294). In response to a hypothetical which contained the final mental residual functional capacity and findings outlined by a state agency psychologist, Cheryl Woodson Johnson (R. 208-211), Fannin found that the Plaintiff could not perform her past relevant occupation. (R. 294). However, Mendez would be able to perform light work in the national economy such as an office helper or a cashier. (R. 296).

The ALJ then asked if an individual with the Plaintiff's mental limitations and the need to miss two to three days per month would be employable. The VE responded as follows: "She would be able to perform the task for jobs, but she would not be able to maintain employment." (R. 296).

Fannin further explained that "moderately limited" would mean that an individual would not be able to perform a job "a third of the day," and therefore would not be able to work. While "mildly limited" would mean that an individual would not be able to perform a job "up to one third of a day," and therefore would be able to work. (R. 297-298). Another concern would be transportation of getting to and from work. (R. 301).

Additionally, the VE agreed that according to a report from Dr. Baralt[3] (R. 234-240), a person with those marked impairments would not be able to do any kind of work. (R. 295). The VE also noted that the Plaintiff would not be able to perform her past relevant work with the residual functional capacity set forth by Dr. Cuello[4] in his report. (R. 295). According to the VE, unskilled jobs require a person to maintain work demands with less leniency than a semiskilled or a skilled job. (R. 298).

In response to a question by counsel for the Plaintiff, Fannin stated that certain cashier positions, like retail, are high pace and volume and that it would be difficult for Mendez to maintain these positions. These high demand cashier positions would decrease the total number available in the national economy by about 25 percent out of "maybe a total of 200,000 nationwide." (R. 299-300).

In addition to the testimony presented at the hearing, medical records were submitted to the ALJ. The Plaintiff was seen at Baptist Hospital of Miami on May 24, 2003, January 30-31, 2004 and and October 9, 2004 for migraine headaches, chest pain, malaise, fatigue and multiple sclerosis. (R. 108-110, 128-159, 216-233).

---

[3] The trial transcript shows a Dr. Ferrell, but the correct name is Dr. Baralt.

[4] The trial transcript shows a Dr. Qualo, but the correct name is Dr. Cuello.

The Plaintiff was seen at the Neurologic Center of South Florida from February 12, 2003 to October 22, 2003 by Perla I. Periut, MD. (R. 111-127). Dr. Periut noted that Mendez was being seen for "possible early neuropathy and migraine headaches," however, the symptoms of neuropathy were improving with Topamax while the headaches had become worse since December. (R. 123-124). On April 21, 2003, a CT of the brain without IV contrast was normal. (R. 120). According to office visit notes from October 22, 2003, the impressions noted by Dr. Periut were that the Plaintiff's headaches had become more frequent and intense, and the neuropathy had improved with Pamelor. (R. 111-112). A Bellsouth Application and Certification for Leave form completed by Dr. Periut stated that the Plaintiff would need to be absent from work for neurological treatment from May 26, 2003 to June 13, 2003. (R. 117-118).

Medical Records from Jorge L. Cuello, M.D. were submitted from June 30, 2003 which state that the Plaintiff was last seen on June 2002, however, no records from that visit were submitted. Dr. Cuello completed a Questionnaire which states that he has examined Mendez a total of ten times from June 3, 2002 to May 31, 2005. (R. 241-251). The questionnaire notes the Plaintiff's diagnosis as hypertension, multiple sclerosis and (+) ANA overlap syndrome; and her symptoms as vertigo, loss of balance, headaches, palpitations and chest pain. (R. 241). According to Dr. Cuello, these symptoms are consistent with his objective and clinical findings, and the Plaintiff has been unable to perform sedentary work on a sustained basis since October 23, 2003. (R. 242).

The questionnaire further notes that the maximum number of hours that Mendez would be able to sit and stand is "one or less;" the maximum amount of weight that she would be able to lift occasionally is 5 pounds; and she requires complete freedom to rest frequently and without restriction, and would have to lie down for substantial periods of time during the day. (R. 242-243).

Additionally, the questionnaire notes that in an eight hour workday, the Plaintiff would never be able to bend, stoop, crouch, kneel, crawl or climb stairs, and the prognosis of the patient's condition is chronic. (R. 243).

The Plaintiff was seen by Diana Baralt, M.D. from July 15, 2003 to March 3, 2005, however, the psychotherapy notes are not legible. (R. 160-169, 252-268). Dr. Baralt completed a Mental Capacities Evaluation on April 21, 2005 which states that Mendez had a "poor" ability to understand, carry out and remember simple instructions; perform simple tasks; independently perform routine repetitive tasks; use judgment; perform work requiring regular contact with others; relate appropriately to the public; and respond appropriately to usual work situations. (R. 235, 238-239). The Plaintiff's condition was noted as "depression 2nd med. condition s/p CVA; major depression with psychosis," and her prognosis was noted as "poor." (R. 236). According to the evaluation, the Plaintiff's impairments lasted or can last for 12 months or longer and her impairments have been present since at least October 23, 2003. (R. 236).

Dr. Baralt's further states that the Plaintiff is "unable to work at all" and notes that Mendez had "marked" ability to sustain concentration/attention to task; achieve goals and respond to time limits; relate appropriately to supervisors and co-workers; respond appropriately to changes in a routine work setting; respond appropriately to the stress of customary work pressures in work environment; maintain production standards; make simple work-related decisions; perform activities within a schedule; maintain regular attendance; and be punctual within customary tolerances. (R. 237-240). The evaluation further notes that Mendez had a "fair" ability to maintain socially appropriate behavior and adherence to basic standards of neatness and cleanliness. (R. 239).

A Treating Source Mental Health Report from Dr. Baralt was submitted which found the

Plaintiff unable to sustain work activity for eight hours a day, five days a week due to "severe memory problems and inability to cope with stress." (R. 214-215).

On January 31, 2004, reports of Radiological Consultation were submitted which showed that the heart, lungs and pleura appear normal and that a CT without contrast of the brain also appeared normal. (R. 155-158).

Ivan F. Danger, Ph.D. performed a Psychological Evaluation on April 13, 2004 and noted that there were no medical records in the referral packet to corroborate the Plaintiff's description of her psychiatric treatment. (R. 170-174). Dr. Danger described the results of his evaluation as follows:

> There were no indications of obsessive thoughts noted in her thought content. Compulsive behaviors were not noted and phobic reactions were not reported. Her thought production was logical and coherent. Her thought flow was rather increased. The degree of depression was moderate and she denied suicidal ideation. She cried throughout the evaluation and at times, we needed to stop because it was profuse. There is no history of hallucinatory experiences. She was alert and oriented X3. Her long term memory appears to be adequate. Her recent memory was found to be also adequate, as she was able to recall 3 words out of the 5 that were presented to her after a ten-minute interval. There were no major difficulties noted within her short memory or immediate memory, she was able to recall 6 digits forward and 4 backwards. Her attention and concentration skills were also adequate, although she made some errors within the serial sevens task. Her judgment and common sense at the present time, are somewhat contaminated by her depressive state. There were no difficulties noted within her calculation ability. She has relatively good insight. Her affect was appropriate while her mood was depressed to a moderate degree.
>
> ...
>
> There were no indications of dysfunction. Her cognitive functioning appears to be adequate, although she seems to be rather distressed and anxious.

(R. 171). Additionally, the diagnostic impression was listed as follows:

9

|         |                                                          |
|---------|----------------------------------------------------------|
| Axis I: | 300.00 Anxiety Disorder NOS with panic attacks           |
|         | 296.24 Major Depressive Disorder, Non Psychotic, Moderate |
| Axis II: | Deferred                                                |
| Axis III: | No conditions reported                                 |

(R. 171).

According to Dr. Danger, once the Plaintiff's emotional state is stabilized, she "might benefit from some re-direction in her vocational and professional objectives." (R. 172).

A Psychiatric Review Technique form dated April 27, 2004 found the affective disorder of MDD and the anxiety-related disorder of "anxiety d/u." (R. 178, 180). The Technique also found that the Plaintiff had moderate restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. (R. 185).

A Mental Residual Functional Capacity Assessment prepared on the same date found that the Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to travel in unfamiliar places or use public transportation and the ability to set realistic goals or make plans independently of others. All other categories were marked "not significantly limited." (R. 189-192).

A second Psychiatric Review Technique form dated July 29, 2004 found the affective disorder of decreased energy and "major depressive disorder, non psychotic moderate" and the anxiety-related disorder as autonomic hyperactivity and "anxiety disorder, nos with panic attacks." (R. 197, 199).

The Technique also found that the Plaintiff had moderate restrictions of activities of daily living; mild difficulties in maintaining social functioning and concentration, persistence or pace, and no episodes of decompensation. (R. 204).

A Mental Residual Functional Capacity Assessment prepared on the same date found that the Plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. All other categories were marked "not significantly limited." (R. 208-211).

A Medical Summary Sheet completed on August 3, 2004 notes the primary diagnosis as "migraine headaches" and the secondary diagnosis as "possible HBP." (R. 212-213). The Summary notes that the Plaintiff's impairments were not severe and did not affect her function. The medical consultant's rationale for action is as follows: "had 2 negative CT scans of the brain. On no daily medication for migraines. Questionable history of HBP - no evidence of elevated BPs in MER, but is reportedly taking Cardizem." (R. 212).

Additionally, in October 2004, Reports of Radiologic Consultation of the chest and brain were submitted which showed that the lungs were clear and the brain was normal. (R. 230-233).

The record also lists the medications taken by the Plaintiff as Topamax, Pamelor, Cardizem, Zyrtec, Effexor, Xanax and Ambien. (R. 112, 114, 126, 170, 247, 249, 251).

On July 22, 2005, the ALJ issued a decision finding that the Plaintiff's impairments of mental disorders and hypertension were severe, but that the impairments did not meet or equal the severity

in the listing of impairments. (R. 20-31). The ALJ also found that the Plaintiff's allegations regarding her limitations were not totally credible. (R. 27). According to the ALJ, Mendez was unable to perform her past work as a customer service representative. (R.28). However, the ALJ determined that based on the Plaintiff's age, education and work experience, she could be expected to make a vocational adjustment to work as an office helper or cashier, which jobs exist in significant numbers in the national economy. (R. 30).

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Barnes v. Sullivan, 932 F.2d 1356,

1358 (11th Cir. 1991); Baker v. Sullivan, 880 F.2d 319, 321 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991); See also, Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are

13

awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The claimant bears the initial burden of proving that she is unable to perform previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work performed, not to merely a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

In the present case, the ALJ found, at step five, that the Plaintiff could not perform her past relevant work, but retained the capacity to adjust to work that existed in significant numbers in the national economy. The Plaintiff contends that the ALJ erred as follows: (1) by improperly rejecting the opinion of the Plaintiff's treating neurologist concerning the Plaintiff's exertional limitations; (2) by improperly assessing the Plaintiff's residual functional capacity and (3) by failing to establish other work in the national economy that the Plaintiff could perform.

In her first argument, the Plaintiff contends that the ALJ erred by improperly discounting the opinion of the treating physician in stating that the Plaintiff had no exertional limitations, and moderate mental limitations.

The opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been seen when the treating doctor's opinion was not bolstered by the

14

evidence; the evidence supported a contrary finding or the opinion was conclusory or inconsistent with the physician's own medical records. If the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate his reasons. See, Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004).

In the present case, the ALJ specifically noted the findings by Dr. Cuello as follows:

> In a medical report dated May 31, 2005, Jorge Cuello, M.D., diagnosed hypertension, multiple sclerosis, and positive ANA overlap syndrome. Also, the claimant could not lift more than five pounds occasionally. She could never bend, stoop, crouch, kneel, crawl, and stair climb (Ex. 14F). However, the undersigned notes that this medical findings and otherwise documented in the record do not support a finding that the claimant's medical condition is of disabling severity, nor does Dr. Cuello's opinion provide an assessment of the claimant's residual functional capacity, which is entirely compatible with the record as a whole. The treating physician appears to have taken the claimant's subjective allegations at face value and merely reiterated those allegations in his report. The undersigned give this opinion little weight.

(R. 27).

The ALJ also noted that with proper treatment and medications, the Plaintiff's condition should not expect to last a year or longer. (R. 27). The ALJ adequately set out reasons for giving little weight to the opinion of Dr. Cuello. This determination is supported by substantial evidence and there is no basis for relief.

The Plaintiff also contends that the ALJ made an improper residual functional capacity determination by rejecting the opinion of the treating psychiatrist, Diana Baralt, M.D. In reviewing Dr. Baralt's records, the ALJ noted as follows:

> Dr. Baralt is the claimant's treating physician. Their opinion must be given controlling weight if they are well supported by medically acceptable clinical and diagnostic techniques and are not inconsistent

> with the other substantial evidence (20 CFR 404.1527). In this instance, Dr. Baralt's assessment of the physical capacity is inconsistent with the substantial medical evidence, and is not supported by the progress notes. Dr. Baralt's evaluations were not supported by the objective medical evidence. Although Dr. Baralt's opinion has been duly considered, in view of the overall record, they are not found to be persuasive. Accordingly, the undersigned cannot accord great weight to their opinions. Instead, the undersigned accords great weight to the opinion of Dr. Woodson, as they are consistent with the evidence of record.

(R. 27).

According to the ALJ, the limitations found by Dr. Baralt were inconsistent with the substantial medical evidence and not supported by the record. The ALJ adopted the mental limitations found by Dr. Cheryl Woodson (as noted in Exhibit 9F) and Dr. Ivan Danger. In reviewing Dr. Danger's evaluation, the ALJ noted as follows:

> In a psychological evaluation report dated April 13, 2004, Dr. Danger noted that the claimant's depression was only moderate. On exam, Dr. Danger indicated that there were no indications of obsessive thoughts noted in her thought content. The claimant's compulsive behaviors were not noted and phobic reactions were not reported. The claimant's thought production was logical and coherent. Her thought flow was rather increased. The degree of depression was moderate and she denied suicidal ideation. There was no history of hallucinatory experiences. The claimant's long term and recent memory appeared adequate. It appears that the claimant's condition gets better with medications (Ex. 5F/4).

(R. 27).

The ALJ concluded that the Plaintiff's allegations were not fully credible to the extent alleged and that there were no mental limitations which would impact on the Plaintiff's ability to perform other jobs in the national economy such as office helper and cashier. This Court notes that the "determination of residual functional capacity is within the authority of the ALJ and the assessment

should be based upon all the relevant evidence of a claimant's remaining ability to do work despite her impairments." Beech v. Apfel, 100 F. Supp.2d 1323, 1330 (S.D. Ala. 2000), citing 20 C.F.R. § 404.1546, Lewis v. Callahan, 125 F.3d at 1440.

The record shows that the Plaintiff testified that she does not take a shower three to four days per week (R. 289-290) and is unable to care for her daughter (R. 282-285) due to her emotional state. At the hearing, the ALJ made it clear that he was trying to determine if the Plaintiff's problems were a lack of "motivation" or a "physical impairment." (R. 283). However, this Court notes that the Plaintiff also testified that she has thought about committing suicide and that her family has a history of emotional problems, including suicide, murder, attempted suicide, nervous breakdowns and being bipolar. (R. 286-287). Additionally, the records of the Plaintiff's visits with her treating physicians show that the symptoms claimed by the Plaintiff were expressed during the examinations and that a diagnoses of depression was made. Thus, it cannot be said that the mental limitations found by the treating physician were so contrary to the evidence as to be afforded little weight.

Accordingly, this Court agrees with the Plaintiff that the ALJ should have sought additional information from Dr. Baralt regarding the basis for her opinion and obtained an updated functional assessment from her. The ALJ erred in so finding, and a remand on this basis for further proceedings is required.

The Plaintiff also contends that the ALJ erred by failing to establish other work in the national economy that the Plaintiff can perform. Specifically, the Plaintiff argues that the Defendant failed to meet its burden at step five due to an incomplete hypothetical question and a conflict between the testimony by the vocational expert and the Dictionary of Occupational Titles.

In addressing the VE's opinion at the hearing, the ALJ states as follows:

> It was the Vocational Expert's opinion that the hypothetical individual could perform the following jobs in the national economy:
>
> | Jobs | [Florida] | [Tri County] | [Nationally] |
> |---|---|---|---|
> | Office Helper 239.567-010 | 800 | 300 | 18,892 |
> | Cashier 211.462-010 | 10,000 | 2,000 | 19,000 |
>
> Based on the testimony of the Vocational Expert, the undersigned has concluded that considering the claimant's age, educational background, work experience, and mental residual functional capacity, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore reached within the framework of the Medical-Vocational Guidelines.

(R. 29).

The Plaintiff raises two arguments relating to her physical and mental limitations which the Plaintiff claims were not properly addressed by the ALJ. Based on the determination made earlier, this Court finds that the physical limitations were properly dealt with by the ALJ, and thus, there is no basis for error. However, the Court agrees with the Plaintiff that there is confusion about the definition of the term "moderate" in connection with the VE testimony and the DOT which shall be remedied on remand.

Accordingly, on remand, the ALJ shall obtain further testimony from the VE for clarification on the Plaintiff's ability to perform work under her current limitations and issue a new decision. While error is present, this Court cannot find on the record that an award of benefits to the Plaintiff is required at this time.

### III. CONCLUSION

Based on the foregoing, this Court finds that the decision by the ALJ is not supported by substantial evidence. Accordingly, it is **ORDERED AND ADJUDGED** as follows:

(1)   The Motion for Summary Judgment filed by the Defendant (D.E. #17) is **DENIED**.

(2)   The Motion for Summary Judgment filed by the Plaintiff (D.E. #18) is **GRANTED in part**.

(3)   The decision of the Commissioner is REVERSED AND REMANDED for further proceedings consistent with this Order.

**DONE AND ORDERED** this 12 day of September, 2007.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE

cc:   Carole M. Fernandez, AUSA
      Lyle D. Lieberman, Esq.